Joseph Robert Giannini, Esq.  (PA SB #38814)
925 S. Westgate Ave. #102
Los Angeles, CA 90049
Phone 310 442 9386
Fax 310 826 7989

Attorneys for Plaintiffs

ORIGINAL
FILED

MAY 1 0 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DMR

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

CV 10 2014

| | |
|---|---|
| TANESHA WALLS BLYE,<br>JOEL D. JOSEPH,<br>DENNIS E. WIESSNER, JR.<br>ROBERT STEVEN MARTINEZ,<br>RICHARD A. HAKE,<br>JAMES McDONALD,<br>W. DOUGLAS CAROTHERS,<br>JAMILLA MOORE,<br>NATIONAL ASSOCIATION for the<br>ADVANCEMENT of<br>MULTIJURISDICTION PRACTICE<br>(NAAMJP),<br><br>Plaintiffs<br><br>vs.<br><br>HON. ALEX KOZINSKI, CHIEF<br>JUDGE, NINTH CIRCUIT JUDICIAL<br>COUNCIL,<br>HON. DAVID R. THOMPSON,<br>HON. SYDNEY R. THOMAS,<br>HON. SUSAN P. GRAEBER,<br>HON. M. MARGARET McKEON,<br>HON. ROBERT H. WHALEY,<br>HON. ROBERT S. LASNIK,<br>U.S. DISTRICT for the NORTHERN<br>DISTRICT OF CALIFORNIA,  CHIEF<br>JUDGE HON. VAUGHN R.WALKER<br>U.S. DISTRICT for the EASTERN<br>DISTRICT OF CALIFORNIA, | CIVIL ACTION NO<br><br>COMPLAINT FOR INJUNCTIVE &<br>DECLARATORY RELIEF<br>INVALIDATING FEDERAL DISTRICT<br>COURT "LOCAL" RULES THAT DENY<br>*GENERAL* ADMISSION TO SISTER-<br>STATE ATTORNEYS UNDER:<br>1.  28 U.S.C. §§ 2071-2072, §332(d)(4)<br>2.  5th AMEND. EQUAL PROTECTION<br>3.  5TH AMEND. DUE PROCESS<br>(PROCEDURAL AND SUBSTANTIVE)<br>4.  SUPREMACY CLAUSE<br>5.  DECLARATORY JUDGMENT (28<br>USC § 2201)<br><br>DEFENDANT CLASS ACTION |

Complaint                                                                    Page 1 of 48

CHIEF JUDGE HON. ANTHONY W. )
ISHII, U.S. DISTRICT COURT for )
the CENTRAL DISTRICT OF )
CALIFORNIA,  and CHIEF JUDGE )
HON. AUDREY B. COLLINS, )
U.S. DISTRICT COURT for the )
SOUTHERN DISTRICT OF )
CALIFORNIA, CHIEF JUDGE )
HON. IRMA E. GONZALES, )
                                                    )
            Defendants )
                                                    )

_____

## INTRODUCTION

1. This case presents 21st Century issues of first impression, arising from the sacred Bill of Rights' freedoms of speech, association, and to petition the government for redress of grievances, the near century of U.S. Supreme Court precedent holding the right to practice law before federal courts is <u>not</u> governed by State court rules, <u>In re Poole</u>, 222 F.3d 618, 620-22 (9th Circ. 2000), the U.S. Supreme Court's decision holding bar admission on motion is a constitutionally protected privilege and immunity, <u>Supreme Court of Virginia v. Friedman</u>, 487 U.S. 59 (1988), and the <u>Rules Enabling Act</u> which provides that United States District Court "local" Rules "shall be consistent" and they "shall not abridge, enlarge or modify any substantive right."

2. The US Supreme Court has held that professional norms articulated by the American Bar Association are "(s)tandards to which we have referred as 'guides to determining what is reasonable.'" <u>Wiggins v. Smith</u>, 539 US 510, 524 (2003). The American Bar Association <u>Report of the Commission on Multijurisdictional Practice</u>[1] (2002) carefully studied *Client Needs in the 21st Century* in open hearings held all over

_____

[1] American Bar Association, <u>Report of the Commission on Multijurisdictional Practice</u> available on line at <u>http://www.abanet.org/cpr/mjp/intro-cover.pdf</u>.

the United States, recommending State's adopt admission on motion for experienced attorneys, concluding the requirement and ritual of taking another bar exam injures the public. This ABA conclusion was facilitated by revolutionary changes in technology and increasing globalization, endorsed by the Conference of Chief Justices, and adopted in 39 States.  The ABA also recommended that U.S. District Courts eliminate "local" rules that deny reciprocal *general* admission privileges to experienced sister-state attorneys from outside the forum State because such discriminatory rules — are anti-competitive, inefficient, drive up the costs of litigation, and interfere with the right to counsel of choice.

3. The ABA's recommendation for reciprocal licensing on motion for experienced attorneys is collaterally reinforced by scientific findings from the emerging field of *expertise and expert performance*. See K. Anders Ericsson, Ed., The Cambridge Handbook of Expertise and Expert Performance (Cambridge University Press 2006). Cognitive scientists have concluded that it takes 10,000 hours to develop true expertise in any field, taking the brain this long to assimilate all that it needs to know to achieve true mastery. Experienced experts surpass novices, those new to a profession, in seven major ways: (a) generating the best solution; (b) pattern recognition; (c) qualitative analysis; (d) self-monitoring skills in terms of their ability and knowing what they don't know; (e) choosing appropriate strategies; (f) seeing and exploiting opportunities; and (g) cognitive effort, meaning they work faster, with less effort, and greater control.  Id. at 27.  Cognitive scientists have concluded the highest levels of expertise, like Tiger Woods golf swing at the Masters on the 18th hole, or Newton postulating the laws of gravity "in a contemplative mood …occasioned by the fall of an apple,"[2] are characterized by contextually based intuitive actions that are automatic, sub-conscious, and difficult or impossible to report verbally. Thus, the rule of thumb that one State's lawyers are more competent to practice law than another State's lawyers — a theory

---

[2] Stephen Hawking, A Brief History of Time 2nd. Ed, p. 5 (1998 Bantam)

born in the 1930s separate but equal era — has been rejected by the ABA, empirically refuted by cognitive science, and disavowed by the High Court in <u>Supreme Court of Virginia v. Friedman</u>, *supra*, 487 U.S. 59 (1988).

4.   This case is also about man's phylogenetic  (acquired in the course of the history of the species) need for exclusive relationships characterized by an "us against them mentality," [3] the tendency of human beings to fence themselves off (a phenomena know as "club formation"),[4] and the resulting in-group aggression against outsiders whereby man stigmatizes and casts outsiders as aliens, dehumanizing them in order to maintain group cohesion and dominance.[5]  Thanks to environmental changes, it is not uncommon for an adaption to reverse itself, for it to be retained as a historical vestige, while it has become in effect a functional hindrance, and often dangerous like the appendix. Times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress.

5.   Throughout history culturally institutionalized mental models of the world — like the theories concluding that the sun revolved around the earth, that evil spirits infected women making them witches, that blacks are congenitally inferior — have proven ill-founded and irrational by better information in an evolving society.  Likewise, the sacred cow — the popularly held belief that the California bar exam for experienced sister-state attorneys is the gold standard — is a similar myth proved false under examination.  Five nationally respected testing experts, including experts from the National Conference of Bar Examiners and the California State Bar's own testing expert, have concluded similar 100% subjective high-stakes licensing tests are not valid

---

[3] Irenaus Eibl-Eibesfeldt, <u>Love and Hate: The Natural History of Behavior Patterns</u>, (Aldine De Gruyter 1996)  p. x.

[4] <u>Id</u>. p. 14
[5] <u>Id</u>. at p. 6

or reliable measuring devices. They fail to meet well established testing <u>Standards</u>.[6] Moreover, these 100% subjective experienced attorneys' high-stakes test results are inadmissible in federal court under <u>Daubert v. Merrill Dow Pharmaceuticals</u>, 509 U.S. 579 (1993) and the Federal Rules of Evidence 700 series.  Moreover, there is no cause and effect nexus what-so-ever between practice in the U.S. District Courts and this putative licensing test.

6. Plaintiffs in this case are members of the bar of numerous federal and State courts, received into an ancient fellowship for something more than private gain; they are like the Court itself, instruments of justice.  Plaintiffs, in comporting with their constitutional obligation to vindicate federal rights and champion access to the Courts, petition for a Consent Decree or a Declaratory Judgment invalidating all U.S. District Court "local" rules in the Ninth Circuit that that do not provide equal *general* admission privileges to all State licensed attorneys under the <u>Rules Enabling Act</u>, Fifth Amendment Due Process and Equal Protection, Supremacy Clause, and the U.S. Supreme Court's decision holding bar admission on motion is a constitutionally protected privilege and immunity. <u>Supreme Court of Virginia v. Friedman</u>, *supra*, 487 U.S. 59 (1988).

## JURISDICTION & VENUE

7. This Court has jurisdiction under 28 U.S.C. § 1331. Venue is appropriate as defendants' principal office is in San Francisco, California.

***

---

[6] The <u>Standards for Educational and Psychological Testing</u> (1999) (Published by the American Educational Research Association, American Psychological Association, and the National Council on Measurement in Education) (<u>Standards</u>) were developed "to provide criteria for the evaluation of tests, testing practices, and the effects of test use." <u>Id</u>. at p. 2. "When tests are at issue in legal proceedings and other venues requiring expert witness testimony it is essential that professional judgment be based on the accepted corpus of knowledge in determining the relevance of particular standards in a given situation.  The intent of the <u>Standards</u> is to offer guidance for such judgments." <u>Id</u>. at 4.

**PARTIES**

8. Plaintiff TANESHA WALLS BLYE (30s) is a black attorney with six years experience in federal practice. At 2,000 hours per year, Plaintiff has over 12,000 hours of unblemished attorney experience.  Plaintiff grew up in a large family in the Bay Area, and went to college on the East Coast, later graduating from the University of Miami Law School with outstanding credentials. She is married with two children. Plaintiff, like many other Americans, recently relocated (back to Oakland) because of her husband's opportunity to advance his career.  Plaintiff's spouse, who is from Florida, accepted a Vice-Principal position at Sky Line High School in Oakland.  Plaintiff is stigmatized and injured personally, professionally, and economically by being denied federal *general* bar admission privileges because of the California U.S. District Court closed shop "local" rule blanket presumption that she is unfit to practice federal law because she is not a member of the "in-group" and deified State Bar of California.  As in Plessy v. Ferguson 163 U.S. 537 (1896), where in the 1890s, Homer Plessy, who was 1/8[th] black, was barred from riding in a "Whites only" train car by Louisiana State law. Now, in the 21st Century, Plaintiff is categorically disqualified from *general* bar admission privileges because the California Federal District Court "local" Rules exclusively borrow California state bar admission rules, trespassing In Re Poole, *supra,* and a century of Supreme Court precedent holding the State and federal court bars are each distinct and autonomous.   Like Homer Plessy, Plaintiff is disqualified to appear even for one turn (*pro hac vice*) in California Federal District Courts by local Rule.  Plaintiff's federally induced injury dehumanizes her; it is a historical vestige stemming from the discredited separate-but-equal culture; identifying and cloaking her, and her family with the stigma of congenital inferiority;  denying her equal employment opportunity, segregating and pre-judging her as a second-class citizen, defaming her and tens of thousands highly qualified federal practice lawyers, fencing off free access to the Courts for already unrepresented minorities, reaffirming Plessy v. Ferguson is good law for bar admission

Complaint

in U.S. District Courts because of "local" Rules the ABA has recommended eliminating 15 years ago.

9. Plaintiff JOEL D. JOSEPH (60s) has been a member of the bar in good standing of numerous United States and Federal Courts for 36 years. Plaintiff has over 70,000 hours experience as a lawyer.  He graduated from Georgetown University Law Center. He has taught law school classes. He has written 10 books on the law; Justice Thurgood Marshall wrote a forward for his book, <u>Black Mondays – Worst Decisions of the Supreme Court</u> (National Press 1987, Imprint Press 2008). Plaintiff's practice is primarily federal; he has appeared in federal courts in 25 jurisdictions; he alleges if he is qualified for *pro hac vice* the Courts believe he is competent, and he thus should be qualified for *general* admission.  Plaintiff lives in California.  He is injured by the California Federal District Court "local' rules that categorically disqualify him from both general and *pro hac vice* admission, as if he is contaminated, an alien, and subhuman because he is not a member of the deified State Bar of California; a political organization and union that has pled guilty to illegal lobbying; and has been held by the U.S. Supreme Court to have violated its members' First Amendment rights.

10. Plaintiff DENNIS E. WIESSNER, JR. (40s) has over 20,000 hours experience as an attorney; he is Vice-President and General Counsel for Sea Launch, LLC, a Boeing International Joint Venture, engaged in the business of launching commercial communications satellites from a sea-based platform.  He supervises United States regulatory matters for a small army of federal and international administrative agencies. Plaintiff is categorically, like the petitioner in <u>Plessy v. Ferguson</u>, denied a seat at the bar in the U.S. District Courts in California, and in other District Courts in the Ninth Circuit because of locally popular hometown prejudice, animus, and aggression against American citizens.

11. Plaintiff Hispanic-American ROBERT STEVEN MARTINEZ (50s) graduated from Ohio State University Law School in 1978.  He has passed bar exams in two

States.  He is admitted in Arizona, along with the Ninth and Tenth Circuits, and he wants to set up practice in San Diego where there is a large population of Hispanic-Americans who can readily use his skills. He exclusively practices federal civil rights litigation, and never appears and has no need to appear in State court. Plaintiff is injured by the California Federal District Court "local" rules that provide enhanced substantive rights to California attorneys and modify and abridge the substantive rights of non-forum State lawyers, who, like himself, have substantial federal court practice and specialize exclusively in federal law. Plaintiff is further injured in his federal practice because Arizona has adopted reciprocal admission on motion, but California has rejected admission on motion, preferring instead to require that even the most experienced sister-state attorneys, including Kathleen Sullivan the Dean of Stanford Law School, to pass a hometown protectionist, 100% subjective, licensing exam, that five nationally respected testing experts conclude fails to meet testing Standards.

12. Plaintiff RICHARD A. HAKE (50s) is a patent attorney, with a Ph.D. in Chemistry. His entire practice is federal or cross-border in nature.  His specialty has virtually nothing to do with California State law.  He lives in San Diego with his wife and children. He cannot find work as a lawyer in this economic downturn, not because his high-tech skill set is not needed, but because of being stigmatized and categorically disqualified from admission in Federal District Courts.  In the eyes of the United States of America, Plaintiff is a second-class citizen based on a historical vestige that fails to take into consideration his specialized knowledge, the ABA's recommendation, the emerging science of *expertise* and *expert performance,* and our global world.

13. Plaintiff JAMES S. McDONALD (40s) is also a patent lawyer.  He graduated *cum laude* from Boston University Law School in 1996, winning the G. Joseph Tauro and Liacos Scholar award.  He is admitted to practice in New York and Massachusetts, several federal Courts, and the United States and Patent and Trademark Office.  He is a former partner at Morgan, Lewis & Bockius LLP with offices in New York City and Palo

Alto.  He alleges his constitutional rights — to equality, interstate travel, free speech and advocacy, association with [his] client, and to petition the United States District Courts for the redress of grievances — are being hijacked by the State of California's monopoly protection licensing scheme that deprives Plaintiff of *general* admission privileges in the California Federal District Courts.

14. Plaintiff W. DOUGLAS CAROTHERS (70s) is also a patent attorney; he has been a member of the bar for 47 years, and IP counsel for high-tech firms in Silicon Valley, including Infinera Corporation and Xerox Corporation.  He alleges: "Federal practice and procedure are uniform and guided by federal law. U.S. District Courts have jurisdiction over many areas of federal practice, such as patents, trademarks, copyrights, securities, and bankruptcy.  The present federal licensing rules that require me to jump through the State of California's burdensome licensing rules to practice patent law in federal court are arbitrary."

15. Plaintiff JAMILLA A. MOORE is a (40s) black attorney with 15 years experience representing defendants in California capital and habeas corpus cases.  She is admitted in California and wants to move to another State and enter federal bankruptcy practice.  She cannot afford to take time off from work to study for another bar exam.  She admits, with good reason, based on the California statistics that show blacks passing the bar exam at 50% lower rate than whites, that she does not trust bar examiners. She is injured by U.S. District Court local Rules that, on their face, disregard the ABA's carefully studied conclusion that reciprocal admission on motion should be the norm in the 21st Century.

16. Plaintiff NATIONAL ASSOCIATION for the ADVANCEMENT OF MULTIJURISDICTION PRACTICE (NAAMJP) is a public benefit corporation organized under California law with offices in Los Angeles.  Plaintiff, like other corporations engaged in interstate commerce and advocacy throughout the United States, is directly injured by "local" rules, on their face and as applied, in the U.S. District Courts in the

Complaint                                                                                                      Page 9 of 48

Ninth Circuit that require it to select an in-group attorney it does not want to associate with, and to pay that local attorney in order to exercise its sacred Bill or Rights' freedom to petition in a designated public federal forum for the redress of its federal grievances under a Constitution designed to ensure justice and to form a more perfect Union.

17. The defendants are members of the NINTH CIRCUIT JUDICIAL COUNCIL, including the Hon. CHIEF JUDGE, ALEX KOZINSKI, HON. DAVID R. THOMPSON, HON. SYDNEY R. THOMAS, HON. SUSAN P. GRAEBER, HON. MARGARET McKEON, HON. ROBERT H. WHALEY, HON. ROBERT S. LASNIK, HON. AUDREY B. COLLINS and HON. IRMA E. GONZALES.  Congress has enacted 28 U.S.C. § 332(d)(4), placing on the Judicial Council a mandatory duty to periodically review the Federal District Court local rules within their circuit for consistency with  28 U.S.C. § 2071(a), and 28 U.S.C. § 2072(b), and to abrogate any local Rule found inconsistent. Plaintiffs filed an administrative petition with the Ninth Circuit Judicial Council on October 8, 2009, with supporting exhibits and legal citations.  Plaintiffs have <u>not</u> received any response.  Plaintiffs have <u>not</u> even received an acknowledgment of filing. We can think of *attention* as having a size, capacity, or load. Federal judges already have a million things to *attend* in keeping up with their docket and have difficulty *attending* to all of their duties, in large part because of judicial vacancies.  As of May 3, 2010 there are currently 104 vacancies out of 876 Article III judges.  Judicial emergencies have been declared in 40 of these vacancies; an emergency in the District Court is defined as where the vacancy has existed over 18 months, and each judge is expected to decide 600 cases per year.

18. The remaining defendants are the UNITED STATES DISTRICT COURTS for the NORTHERN, EASTERN, CENTRAL, AND SOUTHERN DISTRICTS of CALIFORNIA and their HON. CHIEF JUDGES VAUGN R. WALKER, ANTHONY W. ISHI, AUDREY B. COLLINS, and IRMA E. GONZALES.  These Chief Judges are being sued in their representative capacity on behalf of the District Courts they preside over

Complaint                                                                                          Page 10 of 48

and the active judges on these District Courts. Plaintiffs submit that it is an unnecessarily duplicative, redundant, and unseemly to individually name every district court judge as a defendant.  Judges AUDREY B. COLLINS and IRMA E. GONZALES are also wearing a second hat serving as members of the defendant Judicial Council.

## DEFENDANT CLASS ACTION ALLEGATIONS

19. This Complaint is being appropriately filed as a Defendant Class Action. FRCP 23(a) provides that "(o)ne or more members of a class may sue or be sued as a representative party."  Civil rights litigation has frequently resulted in defendant class actions. See Robert H. Klonoff, Class Actions and Other Multi-Party Litigation, p. 290 (West Nutshell Series 2005).  In a defendant class action, the focus is on whether the plaintiff would be subject to incompatible standards. See Robert H. Klonoff, *supra* p. 294.  The FRCP 23(a) requirements are numerosity, commonality, adequacy, and typicality.  As to numerosity, there are tens of thousands of experienced attorneys who are injured by these facially discriminatory "local" rules that will not file suit to enforce their constitutional rights because they fear reprisal.  It is impractical and impolitic always to name members of the Judicial Council or judges as a defendant. As to commonality, the legal issues are identical. Congress has squarely held Federal District Court local rules "shall be consistent" and "shall not abridge, enlarge, or modify any substantive right."  28 U.S.C. §§ 2072(b).  Section 2071(a) also incorporates by reference 2072(b).  FRCP 83 further as amended in 1995 incorporates by reference both Sections 2071(a) and 2072(b). As to typicality, "the claims or defenses of the representative parties of the class [are] typical of the claims or defenses of the class." FRCP 23(a)(3).  As to adequacy of representative, it cannot be argued the defendants are not adequate representatives of the Judicial Council or the District Courts in the Ninth Circuit.

***

***

# FACTS

## A. The Ninth Circuit Has Recognized That Technology Has Transformed the Practice of Law

20. In <u>Winterrowd v. American General</u>, 556 F.3d 815, 819-20 (9th Cir. 2009), the Ninth Circuit affirmed technology has dramatically changed the practice of law,

> Even at a time when the largest law firms in the United States were composed of not many more than one hundred lawyers, Judge Friendly observed that we live in an "age of increased specialization and high mobility of the bar." <u>Spanos v. Skouras</u>, 364 F.2d 161, 170 (2d Cir. 1966). But in 1966, there were no personal computers, no Internet, no Blackberries, no teleconferencing, no emails, and the only person who had a two-way wrist radio was cartoon character Dick Tracy. Today, largely because of the benefits of modern technology, hundreds of U.S.-based law firms are composed of many hundreds, or even thousands, of lawyers and support personnel contemporaneously doing business in many states and throughout the world. Lawyers throughout the United States regularly participate in teleconferences and group email sessions with other lawyers in other states, and lawyers and paralegals from one or more firms participate in massive discovery projects arising out of a single case concerning papers and data located in several states. In many such instances, only a small fraction of the lawyers involved in a case are members of the bar of the state where the presiding court sits. Current law does not compel us to be judicial Luddites, and we may properly accommodate many of the realities of modern law practice, while still securing to federal courts the ability to control and discipline those who practice before them.

## B. The ABA MJP Commission Recommends Admission on Motion

21. The American Bar Association Multijurisdictional Practice (MJP) Commission was staffed by a blue-ribbon diverse panel of nationally respected members of the bar. The predicate for this national study was the dynamic change and nature in evolution and scope of legal practice during the past century, facilitated by a transformation in communications, transportation, and technology.[7] Although client needs and lawyer

---

[7] American Bar Association, <u>Report of the Commission on Multijurisdictional Practice</u>, s*upra*, <u>http://www.abanet.org/cpr/mjp/intro-cover.pdf</u> p. 2

Complaint                                                                                    Page 12 of 48

services have evolved, lawyer regulation has not yet responded effectively to this revolution.[8]

22. The purpose of the bar exam is to protect the public against risks that would be posed by lawyers who lack the knowledge and skills expected of *entry-level practitioners*. Entry-level lawyers, similar to newly licensed airplane pilots, are not expected to have the knowledge, skill, and judgment of a battle tested professional with tens of thousands of hours of experience.  One of the key conclusions designed to modernize the practice of law was that experienced attorneys do <u>not</u> need to "reinvent the wheel," and take another bar exam to practice successfully in another state.  The Commission held: "Often, the most significant qualification to render assistance in a legal matter is not knowledge of any state's given law, but knowledge of federal or international law or familiarity with a particular type of business or personal transaction or legal proceeding."[9]  It concluded, what everyone knows, there is a learning curve, what cognitive science calls the 10,000 hour rule, and a first class yardstick measuring competence is prior licensing and experience practicing.[10]  United States Judicial Conference studies empirically prove a direct correlation with experience and competence.[11]

23. As professional athletes instinctively develop their skills over many years, the MJP Commission concluded experienced attorneys are instruments of justice; they

---

[8] <u>Id</u>. p 3.

[9] http://www.abanet.org/cpr/mjp/intro-cover.pdf p. 2

[10] American Bar Association, *Model Rule on Admission by Motion*, August 2002, http://www.abanet.org/cpr/mjp/201g.doc.

[11] "(N)o one has yet devised an examination which will test one's ability to be a courtroom advocate." <u>Report and Tentative Recommendations of the Committee to Practice in the Federal Courts in the Judicial Conference of the United States</u>. 79 F.R.D. 187, 196. "Lawyers with previous trial experience are much more likely to turn in very good performances, and it permits the inference that experience improves the quality of trial performance." <u>Id</u>. at 196. There is a correlation between the quality of trial performance and the prior experience of the attorneys evaluated. 83 F.R.D. at 222.

have an instinct for the law as a result of their training and experience; an attorney's opportunity to use a computer, surf the web, copy, edit, cut and paste *content* from one jurisdiction's law books is technologically, like *Starbucks*, the same everywhere.

24. The MJP Commission also necessarily presumed — if by law, a layman is presumed to know the law, or can presumptively find it, and is presumptively capable of representing herself — *a fortiori* an experienced licensed attorney can do the same. The hypothesis that a layman is presumptively competent, while on the other hand, an experienced lawyer is presumptively incompetent is universally understood as a sham. The MJP Commission further recommended States complete the reciprocity circle by adopting reciprocal discipline, to guard against an attorney escaping discipline by moving to another State.

25. The MJP Commission concluded States that do not have reciprocal admission on motion in the 21st Century **injure the public** by limiting access to experienced attorneys.  (Emphasis added).  The Conference of Chief Justices is composed of the Chief Justice of all 50 states.  The Conference of Chief Justices endorsed the MJP Commission's recommendations.  So far, 39 states have adopted, in substantial part, the ABA's Model Rule for Admission by Motion.[12]

26. Likewise, the Conference of Chief Justices, National Action Plan on Lawyer Conduct and Professionalism (Adopted January 21, 1999), reinforces the MJP Conclusion.  It concludes the vast majority of attorneys are competent professionals, practice in multiple jurisdictions is the norm, and urges interstate cooperation.[13]

27. According to the National Conference of Bar Examiners, over 31,000 licensed attorneys have been integrated into the bar of another State from 2002 to 2006 on motion without taking a bar exam.  Not one of those 31,000 licensed attorneys

---

[12] American Bar Association, Center for Professional Responsibility Joint Committee on Lawyer Regulation, Admission by Motion Rules, Feb. 20, 2007, http://www.abanet.org/cpr/mjp/admission_motion_rules.pdf.
[13] Id.

Complaint

admitted in another State is eligible for admission to the U.S. District Courts in California.

28. Many Honorable California based federal judges have advocated reciprocal licensing be adopted.  See Andrew J. Guilford, Reciprocity Reform: The Future Is Now, California Bar Journal, Jan 2000 p. 7.  U.S. District Judge Guilford, while President of the State Bar of California, argued the failure to have admission on motion "put[s] sand in the gearbox of our industry."  Id. at 7.  Likewise, California federal judges Martha Berzon, Susan Y. Illston, and Lourdes Baird have recommended reciprocal admission on motion be implemented.  See Final Report of the Commission on the Future of the Legal Profession and the State Bar of California (April 1995).  Ninth Circuit Judge A. Wallace Tashima, 20 years ago when he was on the Central District, refused to endorse its exclusionary local rule.  He voted against it.  He concluded that the "challenged rule was unconstitutional, 'outmoded and wrong.'"  See Tashima v. Administrative Off. Of U.S. Courts, 967 F.2d 1264, 1267 (9th Cir. 1992).

C. **The ABA MacCrate Study on Lawyer Competence Finds Bar Exams Test Only One of Ten Essential Lawyer Skills**

29. Robert MacCrate is the distinguished former chairman of the ABA's "Task Force on Law Schools and the Profession" (1992).  The well-regarded "MacCrate Report" describes the skills and virtues necessary to be an effective lawyer.

The "MacCrate Report" identifies ten fundamental lawyering skills:

(1) problem solving,

(2) legal analysis and reasoning,

(3) legal research,

(4) factual investigation,

(5) communication,

(6) counseling,

(7) negotiation,

Complaint                                              Page 15 of 48

(8) litigation and alternative dispute resolution,

(9) the organization and management of legal work,

(10) professional self-development.

30. Nine of ten skills identified as *fundamental* to the successful practice of law cannot be tested on a pen and paper bar exam.  A subjective bar exam only tests legal analysis and reasoning.  Dr. Geoff Norman is a nationally recognized testing expert with over 30 years' experience.  Dr. Norman is one of the experts writing a chapter in the Cambridge Handbook of Expertise and Expert Performance, *supra*.  Dr. Norman writes:

> *"Study after study has shown that it is almost impossible to get judges to agree on scores for essay answers."*

See "So What Does Guessing the Right Answer Out of Four Have to Do With Competence Anyway?" The Bar Examiner, p. 21 (Nov 2008).  Clear and convincing evidence buttresses Dr. Norman's conclusion that it is almost impossible to get graders to agree on subjective test answers; calling into question the validity and reliability of any State's subjective bar exam for experienced attorneys to practice law in the Federal District Courts; and the Plaintiffs' constitutional question, on its face and as applied, whether attorneys in good standing present a clear and present danger that would justify a U.S. District Court's local rule prior restraint on First Amendment freedoms.

31. There are other fundamental deficiencies in giving subjective *entry* level licensing tests to experienced attorneys.  Professional self-development, *after* licensing acquired knowledge through experience cannot be tested for several reasons.  First, there is the matter of jurisdiction.  No State bar exam tests many exclusive areas of federal practice such as patents, intellectual property, copyrights, trademarks, bankruptcy, immigration, admiralty, and federal taxation. Second, one cannot be an expert without experience.  It is well known that "practice makes perfect."  There is a biological basis for this truth:  Neurons that fire together wire together.  Synaptic connections become stronger with use. The more you do something the better you get at it. Third, and equally compelling, the cognitive science of Expertise and Expert

Performance proves *after* licensing, acquired knowledge is often subconscious, intuitive and cannot be tested.  Cognitive science illustrates there is an enormous difference between novices (those new to a profession) and experienced experts.  That difference is intuitive pattern recognition formed by experience.  Dr. Norman writes:

> "Studies of expertise in many other domains — chess, computer programming, physics — show substantially the same thing.  Experts become experts by amassing a huge body of both formal and experiential knowledge." <u>Id</u>. at 20.

32. Intuition, fundamentally, represents an individual's pattern recognition abilities based on bits of knowledge obtained by experience.  When we use intuition, we do not go through a rational analysis of multiple alternatives, with deep evaluation of the consequences of each option.  Intuition is more than simply a gut instinct.  It involves powerful cognitive processes that draw on the wealth of experience that we have stored in our brains.  <u>See</u> Michael Roberto, <u>The Art of Critical Decision Making</u>, (The Teaching Company 2009) p. 69.  "You see a clear distinction between novices and experts.  Novices don't have the experience to engage in the pattern recognition that an expert can employ." <u>Id</u>. at 78. They don't have the base of patterns, the experience, to engage in pattern recognition that an expert can employ.  <u>Ibid</u>.

33. Simply stated, in testing experienced attorneys on *entry* level tests you are comparing apples (experts) with apple seeds (novices).  This selection process penalizes experienced attorneys in the same way that a parking meter fitted for quarters is going to reject a silver dollar.  A quarter may at first glance look like a silver dollar; but a silver dollar is thicker, worth far more, ten times more rare because most exam takers are not already lawyers, and it does not fit in the standard quarter opening.  Thus, Plaintiffs, experienced attorneys in good standing with tens of thousands of hours of experience, in this 21st Century technologically advanced global world, should not be left to the subjective whim of their competition in order to again re-qualify for U.S. District Court bar admission anywhere in the Ninth Circuit.  The mischief and modification that would occur to our Constitution, if Federal Judges were compelled to re-qualify for their

Complaint                                                                                                      Page 17 of 48

federal appointment based on passing State licensing officials' scrutiny is readily apparent, and that mischief and modification also applies to Plaintiffs, as officers of the Court.

### D. The ABA Has Explicitly Recommended That District Court *Local* Rules That Deny Reciprocity Should Be Eliminated

34. The American Bar Association has recommended that the U.S. District Court policy of restricting practice privileges to lawyers who are admitted to the State bar in which the district is located should be eliminated.  Recommendation 8A was adopted by the ABA House of Delegates in 1995. The ABA concluded that "Given the global nature of law practice today, parochial local rules are inefficient, unduly costly to clients and/or lawyers and anti-competitive."

35. In sum, many federal judges, the Conference of Chief Justices, 39 States, and three ABA studies have determined integrating bar admission and reciprocity is an idea whose time has come.  The federal common law is reciprocal bar admission. Plaintiffs in this case are citing chapter and verse to the facts and law they rely upon, rather than a short plain statement, in light of the Judicial Council's non-delegable obligation to conduct mandatory periodic review requirements imposed by 28 U.S.C. § 332(d)(4), the staggering number of judicial vacancies, and because plaintiffs as officers of the Court would be shirking their duty by hiding the facts and law they rely upon. Plaintiffs respectfully submit that good cause exists for the Judicial Council to enter a stipulated judgment or consent decree granting plaintiffs' requested relief.

***
***
***
***
***
***
***
***
***

**FIRST CAUSE OF ACTION**
**VIOLATION OF 28 U.S.C. § 332(d)(4), 28 U.S.C. §§ 2071(a), 2072(b), FRCP 83**

36. Plaintiffs are not aware of any published case challenging U.S. District Court "local" *general* admission rules decided on the basis of Title IV of the <u>Judicial Improvements and Access to Justice Act of 1988</u>.  (Public Law 100 -- 702).  This speaks volumes because Congress re-wrote the <u>Rules Enabling Act</u> as a consequence of widespread discontent with the proliferation of federal court **local** rules, finding that many of these conflict with the national rules of general applicability and Acts of Congress.  Congress concluded that the rulemaking procedures "lacked sufficient openness," there was no meaningful opportunity for judicial review because the judges who make the rules decide whether they are valid, "and of course the barrier to interlocutory appeal built into Federal rule practice …. made effective appellate review of such a rule impossible sometimes, impractical most times, and impolitic always." <u>See</u> David D. Siegel, <u>Commentary on 1988 Revision</u>, following text of 28 U.S.C. § 2071 p. 130-32; following text of 28 U.S.C. § 332 p. 94-95  (West U.S.C.A. 2006).  Mr. Siegel was the Reporter for Congress.

37. Among other changes Public Law 100-702 (1988) added 28 U.S.C. § 332(d)(4), and it amended Section 2071 "thus place[ing] on each Judicial Council a mandatory continuing duty to periodically review the federal district court "**local**" rules promulgated on the authority of § 2071 to **conform to the requirements of § 2072 instead of merely to rules promulgated by the Supreme Court**." (Emphasis added). <u>See</u> Siegel, <u>Commentary on Revision</u>, *supra*.  There is no such thing as a Federal District Court "local" Rule becoming sacrosanct merely for passing initial Judicial Council review the first time. <u>Ibid</u>.

38. The <u>Rules Enabling Act</u> amendments' purpose is a nationally uniform playing field and consistency; and to cabin "local" rule making authority, understanding that judges are <u>not</u> legislators; judges are supposed to interpret law, <u>not</u> legislate it.

39. A bird's eye view of 28 U.S.C. § 332(d)(4), 28 U.S.C. § 2071(a), and 28 U.S.C. § 2072(b) illustrates that each of these provisions are interlocking, interwoven, welding together an identical parallel heightened scrutiny standard of review for Federal District Court "local" rules.

28 U.S.C. § 332. Judicial councils of circuits

(4) Each judicial council shall periodically review the rules which are prescribed under section **2071** of this title by district courts within its circuit for consistency with rules prescribed under section **2072** of this title. Each council may modify or abrogate any such rule found inconsistent in the course of such a review.

- 28 U.S.C. § 2071. Rule-making power generally

(a) The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules **shall be consisten**t with Acts of Congress and rules of practice and procedure prescribed under section **2072** of this title.

- 28 U.S.C. § 2072. Rules of procedure and evidence; power to prescribe

(b) **Such rules shall not abridge, enlarge or modify any substantive right**. (Emphasis added)

40. Section 2071 is concerned with each court making local rules for itself. Section 2072 is concerned with the promulgation of the general rules of national applicability. Section 2071(a) mandates that local Rules "**shall be consistent**."  Section 2071(a) now expressly incorporates by reference the § 2072(b) standard of review. That standard is local "(**R)ules shall not abridge, enlarge or modify any substantive right**."  This is a revolutionary change because the standard of review for Federal District Court "local" Rules is now heightened.  Prior case law held the standard of review is rational basis.  Rational basis judicial review is based on any conceivable basis unsupported by empirical evidence.  Rational basis review essentially means no

review, and this was clearly not the intent of Congress when it enacted Public Law 100-702. Indeed, the standard of review imposed by Congress for local rules is even higher than strict scrutiny because Congress included all "substantive rights" not just constitutional rights: And each Judicial Council has a periodic duty to review the local rules for consistency and to abrogate any inconsistent local rule.

41.  Rules prescribed under 28 U.S.C. § 2072 are approved by Congress. Below is a graphic representation of bar admission based on either National Rules (FRAP 46, Supreme Court Rule 5) or laws enacted by Congress (5 U.S.C. § 500(b)]. All sister-state attorneys are statutorily entitled to practice before these federal courts.



42. Below is a graphic depiction of District Court "local" admission rules.  The "local" attorney admission rules are not uniform and they are not consistent with the National Rules as is required by 28 U.S.C. § 2071(a).   Thirty-four District Courts by local rule already provide *general* admission to all sister-state attorneys and comply with the national rules. District Court "local" rules in Pennsylvania, Ohio, Tennessee, and Missouri are Balkanized intrastate, with some mandating forum State bar membership and others permitting reciprocal admission.



43. The majority of bar admission local rules in the Ninth Circuit violate the <u>Rules Enabling Act</u>.  District Courts in Idaho and Alaska provide *general* admission privileges

to all sister-state attorneys. They are consistent with the National Rules and Acts of Congress.  However, the local rules' patchwork in the other U.S. District Courts are inconsistent with each other, thus they are not consistent with the National Rules and 28 § U.S.C. 2072(b) requirement for uniformity and consistency.

44. District Court local Rules in Arizona, Oregon, and Washington add to this Balkanization by piggy-backing State admission on motion. These States provide back door admission on motion to attorneys who come from States that provide their attorneys reciprocity.

45. Below is a graphic representation of the federal district court "local" bar admission rules when the U.S. government is representing itself.



Admission on Motion to District Courts for Govt Lawyers

46. The District Courts in California, Nevada, and Hawaii deny reciprocity to everyone, as these forum States are in the dwindling minority of jurisdictions rejecting admission on motion, frozen in the separate but equal era.  Thus, bar admission in the Ninth Circuit Federal District Courts by "local" Rules is like playing Russian Roulette on a United States District Court bar admission patchwork full of land mines.  The local rules are also not consistent with the Bill of Rights.  The First Amendment in pertinent part provides:

> Congress shall make no law …abridging the freedom of speech or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

The Sixth Amendment provides a right to counsel of choice. If Congress cannot abridge the First Amendment rights to free advocacy, associations, and petition, then neither can judge-made local rules.  These substantive rights are abridged and modified by the challenged local rules. Plaintiffs, like Homer Plessy are segregated, treated as second class citizens, and disbarred from engaging in core political speech in a designated federal public forum —based on segregationist State bar admission scheme, despite the fact that nearly a century of case law holds the State and federal bars are autonomous, distinct, and each has exclusive authority over its own admission and suspension procedures.

47. The local rules also trespass the limits set forth in 28 U.S.C. § 2072(b) because they categorically modify and enlarge the privileges of forum State attorneys by granting them *general* admission privileges and they categorically modify and abridge the substantive rights of non-forum State attorneys by denying them *general* admission privileges.

48. The local rules unlawfully enlarge the substantive rights of government attorneys, and they abridge and modify the substantive rights of Americans wanting to petition the government by hiring a highly qualified lawyer licensed outside of the forum

State.  For example, Plaintiff DENNIS E. WIESSNER, JR. was previously employed by the federal government.  Under the local rules, a lawyer working for the federal government one day is presumed qualified: The day after he leaves the federal government, he is presumed not qualified.  A lawyer working for the government is trusted to follow the Rules of Professional Conduct: The day after he leaves the government, he is distrusted.  Plaintiff's substantive rights as a member of the bar, received into that ancient fellowship for something more than private gain, are modified and abridged. Courts cannot be independent if its officers are not independent.

49. Plaintiffs RICHARD A. HAKE (Ph.D. in Chemistry), JAMES McDONALD (former partner at Morgan, Lewis and Bockius), and W. DOUGLASS CAROTHERS (former counsel for Xerox) are blue chip intellectual property lawyers. They are members of the patent bar, with tens of thousands of hours of experience.  Congress has exclusive subject jurisdiction over patent law.  The State of California has repeatedly admitted that it has no right to control who is or is not admitted to the federal district courts.  No state tests patent law on its bar exam.  The United States Patent and Trademark Office have its own licensing test.  Plaintiffs' privilege and federal license to practice patent law in the U.S. District Courts in the Ninth Circuit is modified and abridged by the challenged local rules.

50. Dr. Stephen B. Hinshaw is the Chairman of the Psychology Department at the University of California at Berkeley. Dr. Hinshaw reports most of the Big Five personality traits, known as OCEAN, are relatively stable as we age.

O signifies openness;

C is for conscientiousness, dependability, regularity, responsibility;

E is for extraversion, sociability;

A signifies agreeableness or its opposite lack of anger;

N is for neuroticism, comprising a blend of impulsivity, negativism, pessimism.

51. Dr. Hinshaw, however, reports older people get more conscientious, more careful, more diligent, more agreeable, better at managing their emotions, less negative, less willing to go to that party, and generally wiser, evolving as they age.[14]

52. Socioemotional Selectivity Theory" holds as people get older, the greatest determinant of their functioning is not so much the number of years since their birth, but rather their perception of the number of years remaining until their death. As people develop what's called a "foreshortened sense of future horizons," they are motivated to do to two core things. First, they tend to put a higher priority on deepening their existing skills and strengths. Second, they tend to desire to maintain the existing relationships they have, and to enhance their positive experience, emotions, and feelings.[15] The challenged local Rules which extend *general* admission privileges to brand new inexperienced attorneys from the forum State, and categorically deny *general* admission privileges to typically older and wiser experienced attorneys from outside the forum State are a throwback to the era where men believed the sun revolved around themselves, women were possessed by evil spirits, and blacks, Jews, and anyone from outside of the forum State was inferior. This outdated script does not fit life in a global world in the Information Age.

53. Plaintiffs TANESHA WALLS BLYE and JAMILLA MOORE are highly qualified and experienced lawyers. Their liberty to freely travel across our Union and enter federal courtrooms, and petition on behalf of their clients as equal members of the bar, is modified and abridged.  These Ninth Circuit U.S. District Court local rules serve as a role model for other federal jurisdictions to follow. The argument then becomes if the Ninth Circuit violates the law, why shouldn't we?

54. Plaintiff ROBERT STEVEN MARTINEZ is a civil rights lawyer, received into an ancient fellowship for something more than private gain; he is an instrument of

---

[14] Stephen P. Hinshaw, Chapter 11 "Aging, Horizons, and Wisdom," Origins of the Human Mind (Teaching Company 2010) p. 152-57.
[15] Id. at 154

justice like the Court itself.  His liberty to travel and his constitutional privilege to associate with and represent Hispanic-Americans in civil rights cases is abridged and modified by the subject federal "local" rule discrimination. His right to petition which includes the right to petition for federal rights is modified and abridged.  He pays federal taxes and is denied the civil right to represent his clients by "local" rules that are hostile to both the letter and spirit of the <u>Rules Enabling Act</u> and the Constitution.  "No taxation without representation" has worn away to "No representation plus taxation."

55.  Northern District of California Local Rule 11-4(b) *Prohibition Against Bias*, provides:

> The practice of law before this Court must be free from prejudice and bias. Treatment free of bias must be accorded all attorneys, litigants, judicial officers, jurors and support personnel. …"

The "local" Rules charge novice forum State lawyers $210 for *general* bar admission privileges while Plaintiff experienced sister-state attorneys with tens of thousands of hours of experience are fenced off and not eligible for *general* bar admission for any amount of money. Plaintiffs' substantive right to bias and prejudice free treatment under the local Rules, as members in good standing of the bar, is modified and abridged by *general* bar admission fees that provide monopoly protection for forum State lawyers; District Court admission is like a private club, a guild-like closed shop, where bias, prejudice and discrimination against outsiders is institutionalized, thus modifying the First Amendment freedoms to speech, association, petition, access to the Courts, and the Sixth Amendment right to counsel of choice.

56.  U.S. District Courts, largely because of a maladaptive historical vestige, snub hundreds of thousands of dollars in bar admission fees every year from qualified attorneys without any legitimate reason, while in *pro se* cases are clogging the Courts. There are few judges who would prefer in *pro se* filings over filings by experienced federal practice specialists. One-third of the appeals filed in the Ninth Circuit are in *pro*

*se* primarily because people cannot afford to hire lawyers.  The argument that there are already too many lawyers proves empty when it comes time to hire one, and the fees are $500-$600 per hour.

57.  The hypothesis that State admission is a necessary attribute of U.S. District Court bar members, in order to provide for supervision of the ethics of members of the District Court's bar is demonstrably false.  The High Court has rejected the isolationist rationalization that only forum States are capable of supervising the ethics of attorneys practicing in the U.S. District Courts.  Barnard v. Thorstenn, 489 U.S. 546 (1989) held the Virgin Islands justification for discrimination against sister-state attorneys that it did not have the resources to police a nationwide bar membership was insubstantial. Tens of thousands of attorneys are reciprocally admitted in State and federal courts on the basis of a certificate of good standing, or an affirmation that the attorney is a member of the bar in good standing.

58.  The U.S. District Court has an array of in-house tools available for discipline. Northern District of California Local Rule 11-6. *Discipline*, provides:

**(a) General**. In the event that a Judge has cause to believe that an attorney has engaged in unprofessional conduct, the Judge may do any or all of the following:

**(1)** Initiate proceedings for civil or criminal contempt under Title 18 of the United States Code and Rule 42 of the Federal Rules of Criminal Procedure;

**(2)** Impose other appropriate sanctions;

**(3)** Refer the matter to the appropriate disciplinary authority of the state or jurisdiction in which the attorney is licensed to practice;

**(4)** Refer the matter to the Court's Standing Committee on Professional Conduct; or

**(5)** Refer the matter to the Chief Judge for her or him to consider

whether to issue an order to show cause under Civ. L.R. 11-7

Local Rule 11-6(a)(3) expressly authorizes the Court to refer a disciplinary matter to the State or jurisdiction where the attorney is licensed.  There is nothing in the local Rules that says ethical violations can only be referred to the guild-like California State Bar.  Reciprocal discipline is the norm in the Ninth Circuit and everywhere else.  Thus, once a lawyer is suspended or disbarred anywhere, he is suspended or disbarred everywhere, subject to the dictates of due process.

59.  28 U.S.C. § 1738 provides the records of any Court or State are admissible in evidence, and such records shall have the same "full faith and credit" in every court within the United States as they have by law or usage in the Courts of any such State from which they are taken.  The "local" Rules modify and abridge 28 U.S.C. § 1738 by discrediting and denying non-forum State Supreme Court attorney admission records' full faith and credit.  Thus, American citizens' constitutional and substantive right to choose non-forum States' members of the bar as their counsel of choice is modified and abridged.

60. More particularly, since Ex Parte Garland, 71 U.S. 333 (1866), "The right of an attorney and counselor, acquired by his admission, to appear for suitors, and to argue causes, is not a mere indulgence — a matter of grace and favor — revocable at the pleasure of the court, or at the command of the legislature. It is a right of which he can only be deprived by the judgment of the court, for moral or professional delinquency." Id. at 334. Plaintiffs are admitted and in good standing members of the bar in numerous federal and State Courts with tens of thousands of hours of experience.  There is no evidence of moral turpitude or professional delinquency that would warrant their categorical disqualification for membership in any U.S. District Court.  In short, there is no valid scientific correlation between passing the California bar exam and practicing law in the Federal District Courts, as is shown by Plaintiffs'

admission to numerous other federal courts. On the other hand, five nationally respected testing experts have concluded the California attorneys' exam is not a valid or reliable test.

61. Plaintiffs, as members in good standing of the bar, have a constitutional privilege and duty to vindicate federal rights and champion unpopular claims according to the Supreme Court.  Supreme Court of New Hampshire v. Piper, 470 U.S. 274, 281 (1985); Supreme Court of Virginia v. Friedman, *supra*, 487 U.S. 59 (1988)(holding admission on motion is constitutionally protected). This constitutional privilege is modified and abridged by the local rules that piggy-back one State's law onto federal bar admission privileges, and disregard the laws of 49 other States, as if our Union was composed of Snow White and the 49 dwarfs; as if experienced lawyers licensed in other States received into an ancient fellowship for something more than private gain should in the 21st Century be afforded the same scope of federal privileges and immunities as Dred Scot and Homer Plessy.

62. As noted above, this case presents factual and legal issues of first impression.  The Ninth Circuit, however, in Giannini v. Real, 911 F.2d 354 (9th Cir. 1990) decided a similar challenge to former bar admission local rules concluding that the exclusion of sister-state attorneys was *rational.*  The decision is inapplicable because it was decided under the old Rules Enabling Act.  See the Court's analysis 911 F. 2d at 360-61:  "B. Rules of the Supreme Court" — citing as authority the discarded version of 28 U.S.C. § 2071.  Giannini v. Real, is a case where Congress changed the law as the case was being decided, and the Ninth Circuit applied the old law Congress gutted. The amended Rules Enabling Act preempts rational basis review, and holds Federal District Court "local" Rules "shall be consistent" and "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). The decision in Giannini v. Real was also squarely based on the Ninth Circuit precedent subsequently reversed by the Supreme Court in Hillside Dairy Inc. v. Lyons, 539 U.S. 59 (2003).  The Ninth Circuit in both

Giannini v. Real and Hillside Dairy held the State classification in question did not implicate the Privileges and Immunities Clause or Commerce Clause because it did not discriminate solely on the basis of residency or citizenship.  The Supreme Court reversed in Hillside Dairy.  This decision in Giannini v. Real which has been cited throughout the United States as a basis for upholding federal court rules categorically denying bar admission to otherwise qualified lawyers is the product of what psychologists call "confirmation bias."  Confirmation bias refers to our subconscious tendency to gather and rely on information confirming our existing views and avoiding or downplaying information that disconfirms our pre-existing hypotheses.

63.  According to the Hon. A. Wallace Tashima, the challenged local Rules are "unconstitutional, 'outmoded and wrong.'"  See Tashima v. Administrative Off. Of U.S. Courts, supra, 967 F.2d 1264, 1267 (9th Cir. 1992).  Granting plaintiffs' requested relief is a win-win proposition, modernizing the Court on the basis of the best evidence, increasing diversity, lowering the cost of access to the Courts, opening competition, making the Court more responsive to the People it serves, removing the chains from members of the bar, facilitating the Court's independence and neutrality disentangled from State politics where judges have to raise money and run for re-election, increasing revenue by hundreds of thousands of dollars, ensuring justice, and forming a more perfect Union.

## SECOND CAUSE OF ACTION
## FIFTH AMENDMENT VIOLATION OF EQUAL PROTECTION

64. The preceding allegations are incorporated by reference.  The High Court has squarely held admission on motion is a constitutionally protected privilege and immunity. Supreme Court of Virginia v. Friedman, supra, 487 U.S. 59 (1988).  Plaintiffs are thus denied federal equal protection by borrowing State licensing procedures that violate the constitutional norm of reciprocity and In re Poole, supra.

65.  Evolutionary psychology concludes we have mental modules in our brains that have evolved from natural selection, similar to the modules in our brains where speaking (Broca's area) and hearing (Wernicke's area) is processed, to exclude humans and to be aggressive and prejudiced against people who are not members of our primary group.  See Stephen P. Hinshaw, Chapter 22 "Roots of Religion, Aggression, and Prejudice," Origins of the Human Mind (Teaching Company 2010) p. 144. A trigger for aggression and prejudice is out-group status, coming from a different family, group, or religion. "We wish to vanquish, dominate, or even annihilate the oppressed group, lest they oppress us; and we developed a set of cognitive strategies to tell ourselves that we are superior to these out groups." Id. at 146.  We tend to stigmatize them, pre-judge them, and discriminate against them so that we can feel superior to them; as Hitler did with his ethnic cleansing against Jews, blacks, gays, and lesbians for the purity of the Aryan race; as the local Rules do against plaintiffs and other American citizens.

66. The power of the States to control the practice of law cannot be exercised so as to abrogate federally protected rights. NAACP v. Button, 371 U.S. 415 (1963); Sperry v. Florida, 373 U.S. 379 (1963). When state law touches upon the area of these federal statutes, it is "familiar doctrine" that the federal policy "may not be set at naught, or its benefits denied" by the state law. Sola Elec. Co. v. Jefferson Elec. Co., 317 U.S. 173, 176 (1942).  The federal equal protection clause is set at naught by the Balkanized Federal District Court "local" bar admission rules that adopt State law.  States simply do not have nor should they have jurisdiction have over federal bar admission.  And Federal District Courts do not have the constitutional or statutory right to limit their own jurisdiction, by delegating federal jurisdiction over federal bar admissions to the state.  As noted above, "The right of an attorney and counselor, acquired by his admission, to appear for suitors, and to argue causes, is not a mere indulgence — a matter of grace and favor — revocable at the pleasure of the court, or at the command of the

legislature. It is a right of which he can only be deprived by the judgment of the court, for moral or professional delinquency." <u>Ex Parte Garland</u>, *supra,* 71 U.S. 333, 334 (1866), Plaintiffs are admitted and in good standing members of the bar in numerous federal and State Courts with tens of thousands of hours of experience, categorically deprived of U.S. District Court bar admission without any Court judgment of moral or professional delinquency.  The best evidence of their fitness for bar membership and licensure is their unblemished record. On the other hand, there is no empirical evidence they are not qualified, other than local prejudice, and a testing exam that fails to meet testing <u>Standards</u>.

67.  In <u>US. v Ruehle</u>, 583 F.3d 600 (9th Cir. 2009), the Court reversed a California District Judge invoking California State law on attorney-client privilege, holding under the Federal Rules of Evidence the federal common law of privilege is applicable.  The federal common law is admission on motion: evidenced by FRAP 46, Supreme Court Rule 5, 5 U.S.C. § 500(b), Multidistrict Litigation Rule 1.4, and Local Rules in 34 Federal District Courts.  The District Court local rules in the Ninth Circuit that deny reciprocity invades the attorney-client privilege by relying on State law rather than federal law.

68. Many people want to isolate themselves and believe reciprocity is not warranted because their State has higher licensing standards and a harder bar exam. Their race is more pure. Their licensing God is more worthy of worship. Their world revolves around them.  This is a red herring based on incomplete information, wishful thinking, and ill-will identical to the historical exclusion module practiced against blacks and Jews. There is no evidence lawyers licensed in other States and federal courts are sub-standard and not qualified to practice law.  Cognitive science and U.S. Judicial Conference studies prove a direct correlation between competence and experience. The Equal Protection Clause and the purpose of federal jurisdiction, diversity jurisdiction, and life tenure for federal judges is shanghaied by adopting State bar admission procedures that favors local interests and prejudices over national interests.

69. Plaintiffs' Fifth Amendment right to equal protection is also directly trampled by having to satisfy the whim of their competitor in order to obtain *general* admission privileges.  The ABA, in addition to endorsing admission on motion, adopted a first-time bar passage rate of at least 75%, or its member schools risk losing their accreditation.[16] The first-time pass percentage throughout our Union is more than 75%, including California where the July bar exam was 83%.[17] The chart below reflects the disparate impact statistics on the California July experienced attorneys' examination, as compared with the 75% first-time standard, and the experienced attorney pass percentage in the minority of states still requiring experienced attorneys to reinvent the wheel, and take another bar exam.[18]  Most of the plaintiffs, some repeatedly, have been denied federal admission on the basis of this test that five nationally respected testing experts conclude fails to satisfy testing Standards.

| Jurisdiction | 2004 | | | 2005 | | | 2006 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Taking | Passing | % Passing | Taking | Passing | % Passing | Taking | Passing | % Passing |
| **California** | 338 | 131 | 39% | 325 | 92 | 28% | 319 | 114 | 36% |
| **Georgia** | 73 | 65 | 87% | 79 | 69 | 87% | 118 | 103 | 87% |
| **Maine** | 10 | 9 | 90% | 4 | 4 | 100% | 10 | 8 | 80% |
| **Maryland** | 75 | 69 | 92% | 90 | 79 | 88% | 90 | 86 | 96% |
| **Mississippi** | 4 | 4 | 100% | 3 | 3 | 100% | 3 | 2 | 67% |
| **N. Mariana Islands** | 6 | 5 | 83% | 3 | 3 | 100% | 5 | 4 | 80% |
| **Rhode Island** | 20 | 16 | 80% | 13 | 13 | 100% | 16 | 15 | 94% |
| **Utah** | 8 | 8 | 100% | 9 | 8 | 89% | 2 | 1 | 50% |
| **TOTALS** | 536 | 307 | 57% | 526 | 271 | 52% | 563 | 333 | 59% |

70. Statistics, in general, dictate that most populations will have a Bell Curve shaped distribution, with 2/3 of the population within one standard deviation from the

[16] "ABA Votes on Bar Passage Journal" Daily Journal February 13, 2008 p. 3.
[17] Los Angeles Daily Journal November 25, 2008  p.1
[18] From the NCBE web page http://www.ncbex.org/bar-admissions/stats/

mean.  According to the State Bar of California two out of three attorneys already licensed in other States, are a threat to the public and cannot be safely trusted to practice law. The statistics reflect the State content police have a quota.  They have a <u>motive</u> to eliminate sister-state attorney competition. The State Bar's experienced attorneys' bar exam is a cash cow.  They charge twice as much to take the exam as they can collect in annual dues. In <u>Keller v. State Bar of California</u>, 496 U.S. 1 (1990), the High Court reversed the California Supreme Court, unanimously holding the State Bar was for federal purposes akin to a labor union, and it had violated its members' First Amendment rights by engaging in lobbying activities that were not germane to its purpose.  They have the <u>means</u> with their 100 million dollar per year budget, regularly employing highly paid lobbyists to advance their agenda; they have the <u>opportunity</u> to do so with their 100% subjective putative test that fails to meet well established testing <u>Standards</u>, and the California Supreme Court has admitted it is dysfunctional. This putative exam is a false God similar to the prosecution of women for witchcraft.

71.  Obviously requiring experienced attorneys to undergo the burdensome ritual of taking  another State bar exam to obtain District Court admission opens the door to State content discrimination and censorship, similar to what would occur if experienced federal judges were required to be re-confirmed by Congress every time a new President was elected.  It is a prior restraint on Plaintiffs' First Amendment rights, including the right to petition U.S. District Courts.  Supreme Court decisions warn of the dangers of government censorship by licensing officials. "A law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship.  This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." <u>See</u> <u>Lakewood v. Plain Dealer Publishing Co.</u> 486 U.S. 750, 763 (1988).  "A scheme conditioning expression on a licensing body's prior approval of **<u>content</u>**

presents peculiar dangers to constitutionally protected speech." Thomas v. Chicago Park Dist., 534 U.S. 316, 321 (2002).

72. As government officials stopped licensing printing presses based on *content* centuries ago, Dr. Gary Klein, in controlled scientific experimental tests, has demonstrated **licensing officials are less qualified to judge competence than *novices* and *experts* actually working in the profession**.[19]  (Emphasis added)  Dr. Klein played videotapes for three audiences: ten novices who had just finished an 8 hour CPR course; ten CPR instructors who were experienced teachers but have never performed CPR on an actual victim; and ten paramedics who had used CPR many times.  Dr. Klein's study asked each participant to imagine it was his or her life on the line.  They had to identify one of six people in the videotapes who they would want to do CPR on them.  Nine out of ten actual paramedics picked the actual paramedic.  When asked why, they could not point to any one thing other than he seemed to know what he was doing.  The novices generally chose the paramedic. Only three of 10 instructors chose the paramedic to save their lives.  According to the instructors, the paramedic was not following the rules carefully and according to their instructions.[20]  If licensing officials cannot spot the  difference between a novice and an expert on a skill set as basic as CPR, it is a absurd to think they can do so on a skill set as complicated as practicing law based on a 100% subjective test that testing experts conclude fails to meet testing Standards.  This explains why two of three experienced attorneys are failed.

73. The ABA's recommendation for reciprocal admission is further buttressed by ancient writings and 21st Century neuroscience.  Cicero, in speaking about lawyers 2,300 years ago aptly declared: "Just as in the other arts, when the hardest portions of each have been taught, the rest, through being either easier or just like the former, call

---

[19] Sources of Power: How People Make Decisions (The MIT Press 1999).  p. 50 Example 10.1; Ex. 100
[20] Id.

for no teaching; as in painting, for instance, he who has thoroughly learned how to paint the semblance of a man, can without further lessons paint one of any figure or time of life, nor is there any danger that he, who would paint to admiration a lion or bull, will be unable to do the like with many other four-footed animals (there being no art whatever wherein all its possibilities require professorial teaching, since those who have rightly learned the general principles of fundamental and established things attain the rest without difficulty and unaided).[21]

74. Neuroscience proves when we store memories in the healthy adult brain as a result of experience we increase the number of synapses.  Nancy G. Andreasen M.D. Ph.D., The Creating Brain: The Neuroscience of Genius p. 153 (Dana Press 2005). The hippocampus is well-known to neuroscience as a site where memories are consolidated.  Id. at 152.  Studies of London taxi cab drivers have demonstrated the size of their hippocampus is directly correlated with the number of years of experience. "We literally become what we have seen, heard, touched, done, read, and remember." Id. at 146.  In essence, we become lawyers by being lawyers.

75. Plaintiffs' Fifth Amendment right to equal protection and equal access to U.S. Courts and equal rights to petition is undermined by U.S. District Court's abdicating its attorney licensing jurisdiction, and by following forum State bar admission rules, in light of the century of Supreme Court precedent holding the right to practice before federal courts is not governed by State court rules. In re Poole, supra, 222 F.3d 618, 620-22 (9th Circ. 2000); and the Supreme Court's decision in Friedman, supra (holding admission on motion is constitutionally protected).

***

***

***

---

[21] Cicero, De Oratore (Harvard University Press Loeb Classical Library 1996) Book II p. 249

## THIRD CAUSE OF ACTION
## FIFTH AMENDMENT VIOLATION OF PROCEDURAL &
## SUBSTANTIVE DUE PROCESS

76. The preceding allegations are incorporated.  The Ninth Circuit Judicial Council has neither investigated the *validity* or *reliability* of the ABA's recommendation for admission or motion nor has it investigated the *validity* and *reliability* of the California attorneys' experienced attorney test results.  The challenged local rules are based on incomplete evidence.

77. Licensure requirements are designed to protect the public by ensuring that candidates admitted to practice have met certain basic **entry** level qualifications.[22] Similar to a driver's license, a law license is not intended as a guarantee of excellent performance.[23]  Rather, it certifies that new practitioners have met the basic requirements that are designed to provide the public with some assurance that they are qualified to practice.  The educational and testing requirements are designed to provide standardized objective evaluations of the cognitive skills involved in applying professional principles to practice situations by ensuring that candidates admitted to practice have achieved a reasonable level of competence in applying professional skills to commonly encountered practice situations.[24] The bar examination requirement and educational requirement are expected to control one threat to the overall quality of practice — the threat posed by practitioners who lack basic competence.[25] The character and fitness evaluations and requirements tend to focus on whether a candidate has engaged in any activity (e.g. committed a felony, lied about a significant matter) that would indicate a lack of integrity, or has a history of substance abuse.  The

---

[22] Michael T. Kane, "Reflections on Bar Examining" The Bar Examiner,  Nov. 2009 p. 6.
[23] Ibid.
[24] Id. at p 7.
[25] Id. at p 7.

technical quality of testing programs focus is evaluated in terms of two general criteria: *validity* and **reliability**.[26] (emphasis in original)

78. Basically, *validity* analysis addresses the question of whether the proposed interpretations and uses of the test scores make sense and are justified.[27]  The *reliability* of test scores is defined in terms of their consistency (or dependability, or reproducibility) over repeated measurements. *Reliability* addresses the question of whether we would get approximately the same scores if we repeated the test.  If the test scores fluctuate widely from one set of questions to another, or from one grader to another, it is hard to interpret the scores for any particular test administration an indication of a candidate's qualifications.[28] There are standard statistical indices for the *reliability* of test scores. The most basic of these is the *standard error of measurement*. A *reliability coefficient* can be defined in terms of the average magnitude of the standard *error*. A fairly high reliability (above 0.8; preferably above 0.9) is expected for testing programs that are used to make high-stakes decisions about individuals.[29] For example, if two graders agree on the score, the correlation coefficient is 1.00 and if there is no agreement the correlation coefficient is zero.  Bar examinations are high-stakes licensing examinations because they have serious consequences.[30]

79. The State Bar prepares a report on each bar exam for the California Supreme Court.  Standard 14.15 provides that "estimates of the reliability of test-based credentialing decisions should be provided."  In light of Standard 14.15, deeply buried so as to be unnoticeable, the State Bar provides an estimate of the reliability by way of a correlation coefficient.  That is, the degree by which the graders on the *subjective test*

---

[26] Id. at p 7.

[27] Id. at p 8.

[28] Id. at p 9.

[29] Id. at p 9.
[30] Id. at 9.

sections agree with themselves.  The measurement error is another way of referencing the correlation coefficient.  The <u>Report(s) to the California Supreme Court on the California Bar Examination</u> documents the reader correlation on the 100% subjective eight-question subjective tests given to experienced attorneys as follows:

>February 2001 reader correlation .41
>
>July 2001 reader correlation .48
>
>February 2002 reader correlation .38
>
>July 2002 reader correlation .40
>
>February 2003 reader correlation .48
>
>February 2004 reader correlation .39
>
>July 2004 reader correlation .41

80.  These tests fail to meet peer group testing standards.   According to the ABA, the state of the art in testing experienced attorneys for licensing in another state is reciprocity.  These 100% subjective test experienced attorneys are required to hurdle is inadmissible as evidence under the Federal Rules of Evidence 700 series for expert testimony and the <u>Daubert v. Merrill Dow Pharmaceuticals</u>, *supra*, 509 U.S. 579 (1993) line of cases because the results are not reliable, and they are not relevant to the task at hand.

81. As noted above, Dr. Geoff Norman is a nationally recognized testing expert with over 30 years experience.  Dr. Norman is one of the experts writing a chapter in the <u>Cambridge Handbook of Expertise and Expert Performance</u>, *supra.*  Dr. Norman writes:

>*"Study after study has shown that it is almost impossible to get judges to agree on scores for essay answers."*

<u>See</u> "So What Does Guessing the Right Answer Out of Four Have to Do With Competence Anyway?" <u>The Bar Examiner</u>, p. 21 (Nov 2008).

82.  Five nationally respected testing experts have concluded California's 100% subjective high-stakes licensing tests given to experienced attorneys fail to meet testing standards.

83.   First, Dr. Susan Case, the Director of Testing for the NCBE, avows that non-multiple choice format tests, such as essay and performance tests "because of their limitations, such as low reliability, lack of anonymity, and lack of standardization, should not be used in isolation." See Susan M. Case, "Licensure In My Ideal World," The Bar Examiner, p. 27 November 2005.

84. Second, the NCBE's Dr. Kane opines, "If it were feasible to evaluate performance in practice directly, this would be the preferred approach." Michael T. Kane, "The Role of Licensure Tests," The Bar Examiner, *supra*, p. 34 February 2005. According to the ABA and the NCBE, nationally respected peer groups, it is feasible — the preferred approach is to evaluate practice directly based on the attorney's experience.  Dr. Kane, as noted above, states the industry standard for bar examinations is preferably .9.

85. Third, the California Bar's psychometric expert emphasizes the dangerous defect caused by using 100% subjective high-stakes tests in *isolation*.  See Stephen P. Klein, "What Do Test Scores in Texas Tell Us?"  (Published 2000 by RAND) Dr. Klein admits:

> "Our research results illustrate the danger of relying on statewide test scores as the sole measure of student achievement when these scores are used to make high-stakes decisions about teachers and schools as well as students. We anticipate that our findings will be of interest to local, state, and national educational policymakers, legislators, educators, and fellow researchers and measurement specialists." [31]

---

[31] Ex. 108; http://www.rand.org/pubs/issue_papers/IP202/index2.html; See also See Stephen P. Klein, "Essay Grading: Fictions, Facts and Forecasts," The Bar Examiner  p. 23, 25 (August 1985) ("While many bar exam graders believe they can recognize a passing answer when they see one, there is strong empirical evidence to the contrary.")

This Dr. Klein published expert opinion is an evidentiary admission that the California attorneys' exam is fatally flawed. Thus, slavish reliance on this putative gold standard as sole measure of attorney competence should be shelved by the Judicial Council.

86.  Fourth, Dr. Phillip L. Ackerman is a Professor of Psychology at Georgia Institute of Technology; the Editor, Journal of Experimental Psychology: Applied; a Fellow of the American Psychological Association and a member of the American Educational Research Association and the National Council on Measurement in Education (these are the three organizations that generate the Standards on Psychological and Educational Testing).  Dr. Ackerman has reviewed the State Bar's Report to the California Supreme Court on the California Bar Examination and other material he deemed necessary to form an expert opinion.[32]

87. Dr. Ackerman's professional opinion is that the Attorney's Examination for experienced sister-state attorneys fails to meet the Standards for Educational and Psychological Testing.  Multiple Standards have not been met.

88. More particularly, Dr. Ackerman declares, under oath:

"The scores on the Attorney's Examination are determined in a manner that is not consistent with professional standards. The reliability of the test scoring procedures fails to reach a level that would be acceptable for high-stakes testing. (Specifically, inter-rater agreement is quite low, a correlation of .48 between raters indicates only 23% shared variance among ratings; source: Klein & Bolus; Gansk & Associates 2003.) **An acceptable level of reliability for such high-stakes testing would be shared variance in the neighborhood of 70% or higher (corresponding to reliability of about .84 or higher**). (Emphasis added)

---

[32] Over the past 15 years, Dr. Ackerman has published 12 reviews in the Mental Measurements Yearbook (which is generally regarded as the "bible" for critical reviews of commercial, educational, psychological, and organizational tests).  Over the past 25 years, he has consulted on educational and occupational testing for the following organizations: U.S. Air Force, U.S. Army, U.S. Navy,  Personnel Research and Development Center, U.S. Department of Education, Minnesota Air Traffic Control Center (FAA), The College Board, Educational Testing Service (ETS), and General Motors.

Complaint                                                                              Page 42 of 48

89. Dr. Ackerman further concludes the grading process is "arbitrary, because it ensures that some fixed portion of applicants will fail even though all or most of the applicants may in fact be qualified." In other words: A quota.

80. Fifth, Dr. Gary H. McClelland, a professor at the University of Colorado at Boulder is also an expert on statistics and measurement.  Dr. McClelland previously studied the Colorado bar examination, and based on that study wrote "Assessing Bias in Professional Licensing Examinations by Checking Internal Consistency," 9 Law and Human Behavior, No. 3, p. 305 (1985).  Dr. McClelland declares, under oath:

> I have reviewed Dr. Phillip L. Ackerman's "Evaluation of the Psychometric Adequacy of the California Attorney's Examination" dated February 15, 2008, and generally agree with it.  Dr. Ackerman is a credible psychometrician as well. **In my opinion, the lack of an explicit equating procedure for the Essay and Performance Test sections is a fatal flaw**. **The degree of inter-rater agreement is dreadful.  I do not believe any  scientist would ever publish data based on such low inter-rater agreement**. (Emphasis added).

In sum, the California experienced attorney testing scheme by definition is based on junk science because the test results are not valid or reliable.  This junk science test conveniently protects California lawyers from competition in the California Federal District Courts. It does not protect the public.  This alleged gold standard licensing test prophesizes nothing other than the fact that it should be discarded.  Similar to the other discredited and pseudo-scientific paradigms —that the sun revolved around the earth, that evil spirits made women witches, that blacks are innately inferior — it should be abrogated and sent to the District Court local Rule delete bin.

91. The California Supreme Court has repeatedly emphasized it has no right to determine who is admitted to the federal bar.  See, e.g. In re McCue, 211 Cal. 57 (1930).[33]  The California Supreme Court does not follow the Federal Rules of Evidence

---

"The State Bar Act and other statutes enacted for the purpose of regulating the practice of law in this state are applicable to our state courts only.  The federal courts are governed entirely by federal enactment and their own rules as to admission and professional conduct.  This state, should it attempt, and we do not think it has, to

and it does not follow the Daubert line of cases. The Ninth Circuit Judicial Council is worshipping a false God by delegating its jurisdiction to a State Court that disclaims responsibility.  Both the California Supreme Court and the U.S. District Courts disclaim jurisdiction to determine federal bar admission rules. There is a due process void.

92.  Plaintiffs, as instruments of justices and members of an ancient fellowship for something more than private gain, should not be categorically disbarred and subjected to the **dysfunctional** state licensing process in order to qualify for U.S. District Court admission.  California Supreme Court Chief Justice Ronald M. George has testified under oath, the Court is "**dysfunctional,**" and that if something is not done, the backlog of [these mandatory death penalty review] conviction proceedings will continue to grow "until the system falls of its own weight." [34]  The California Supreme Court has 670 capital cases on its swollen docket.  Over one-half of them have not been assigned counsel.  Some have been pending 25 years.  Seventy percent of the habeas petitions from California filed in the federal court are granted. Federal Courts in California are drowning in habeas petitions from the California State Courts, where State hearings are seldom held past the trial Court stage, and where written decisions on federal claims are seldom furnished. Chief Justice George has also blasted California's money-driven ballot measure system, blaming it for creating a "**dysfunctional state government.**"[35] (Emphasis added)

93. Plaintiffs' constitutional right to *procedural* due process has also been violated because they have been denied federal admission without any hearing. Plaintiffs have filed petitions for review in the California Supreme Court Kimberly Jane

---

regulate the practice of law in the federal courts or to place any restrictions or limitations upon the persons who might appear before the federal courts within this state, would be acting entirely without right and beyond its jurisdiction." Id. at 66.

[34] Final Report California Commission on the Fair Administration of Justice **http://www.ccfaj.org/** p. 115

[35] See "Chief Justice Blasts Voter Initiatives" Daily Journal October 12, 2009 (California Constitution has been amended more than 500 times since 1879)

<u>Alfriend v. State Bar of California</u> S172454 (April 2009) and <u>Joseph v. Committee of Bar Examiners</u> S171203 (March 2009).  The 300 page petition in <u>Alfriend</u> asked the California Supreme Court to adopt the ABA's recommendation for reciprocity, providing supporting evidence that five nationally respected testing experts have declared the experienced attorneys' bar exam fails to meet testing <u>Standards</u>. These petitions were denied without a hearing and without the State Bar of California even filing a response. Other experienced sister-state attorneys have also asked for review and been summarily denied. <u>Detrick v. Committee of Bar Examiners</u> S172249 (June 2009); <u>Peacock v. Committee of Bar Examiners</u> S172249 (Oct 2009).  The last time the California Supreme Court granted review to an experienced attorney denied certification on the bar exam was 70 years ago in <u>Staley v. State Bar of California</u>, 17 Cal.2d 119 (1941).  With 670 pending mandatory review capital cases on the California Supreme Court's docket, costing the State of California 670 million dollars a year, plaintiffs' procedural due process right to petition the California Supreme Court for review is a façade that is not available in practice.

94. Plaintiffs' knowledge that the California Supreme Court is admittedly dysfunctional, and it never grants review, not only because of its congested docket, but also because of isolationist tendencies, and it is locally popular to protect California lawyers from competition, preserved their federal claims for a federal judicial forum. <u>England v. Louisiana State Bd. of Medical Examiners</u>, 375 U.S. 411 (1964); <u>United Parcel Service v. California Pub. Util.</u>, 77 F.3d 1178, 1185 (9th Cir. 1996).

95. Plaintiffs are injured by being arbitrarily denied admission to the federal bar under color of State law, without having an opportunity to confront and cross-examine their State accusers, without having any hearing before the dysfunctional California Supreme Court, on the basis of inadmissible hearsay testimony that fails to meet well established testing <u>Standards</u>, and the State bar has a licensing cash cow and profits by reducing competition from sister-state attorneys.

96. The State Bar in its <u>Reports</u> has breached its fiduciary duty of care to warn the California Supreme Court and the public of the well known dangers of using 100% subjective "high-stakes" tests in isolation on experienced attorneys.  The maker of the test has a duty to warn the user of its weaknesses and dangers.   Dr. Stephen P. Klein, who helps write the <u>Report</u> has publicly admitted such 100% subjective high-stakes isolated tests are dangerous.  The <u>Report</u>, however, conceals this material, admitted fact.  This breach of duty illustrates California licensing officials, like the wolf left in charge of the hen-house, have a self-serving agenda in eliminating sister-state attorney competition, like baseball players using steroids to gain a competitive advantage and beef up their wallet.

97. Neither the Ninth Circuit Judicial Council nor the U.S. District Courts have examined the empirical data underlying the California attorney's exam. Standard 1.10 provides,

> "Users should be given sufficient guidance to enable them to judge the degree of confidence warranted for any use or interpretation recommended by the test developer.  Test manuals and score reports should discourage over interpretations of information that may be subject to considerable error.  This is especially important if interpretation of performance on isolated items, small subsets of items, or subtest scores is suggested."

98. The <u>Standards</u>[36] also emphasize that evaluating acceptability (of a test) involves (a) professional judgment that is based on a knowledge of behavioral  science, psychometrics, and the community standards in the professional field to which the tests apply; (b) the degree to which the intent of the standard has been satisfied by the test developer and user; (c) the **alternatives that are readily available** (emphasis added); and (d) research and experimental evidence regarding feasibility of meeting the standard." <u>Id</u>. at 4.

\*\*\*

_____

[36] <u>See</u> Footnote 3.

Complaint                                                                 Page 46 of 48

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE SUPREMACY CLAUSE**

99. The preceding allegations are incorporated.  Plaintiffs are not aware of any published federal case where Federal District Court "local" rules that categorically disqualify non-forum State attorneys for *general* admission privileges was decided under the Supremacy Clause.

100. Under the Supremacy Clause, procedural rules created by the judiciary cannot shrink or expand the scope of federal jurisdiction. <u>Owen Equip. & Erection Co. v. Kroger</u>, 437 U.S. 365, 370 (1978); <u>U.S. v. Sadler</u>, 480 F.3d 932, 937 (9th Cir, 2007). State law has virtually nothing whatsoever to do with many exclusive areas of federal jurisdiction and highly specialized substantive areas of law including patents, trademarks, copyrights, bankruptcy, taxation, securities, and admiralty.  Federal courts are bound to apply rules enacted by Congress over which it has legislative power. <u>Stewart Organization, Inc. v. Ricoh Corp</u>. 487 U.S. 22, 26 (1988). The "local" rules violate the Supremacy Clause by shrinking federal jurisdiction and conflating State jurisdiction with federal jurisdiction.

101. The purpose of the Federal Rules of Civil Procedures is "to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1.  Likewise, "one of the purposes of the Federal Rules of Civil Procedure was to take the sporting element out of litigation."  These goals are subverted by local Rules making it more expensive by categorically excluding attorneys from 49 States; and by turning the just determination of actions into a sporting contest; all-star attorneys from 49 States are categorically disqualified as lead counsel, while novice lawyers who have never set foot in a Federal District Court are categorically pre-qualified to appear as starting pitcher.

102.  "In the realm of private speech or expression, government regulation may not favor one speaker over another." <u>Rosenberger v. Rector and Visitors of the University of Virginia</u>, 515 U.S. 819, 828 (1995).  This inversion of the Supremacy

Clause, i.e. making State law superior to the <u>Rules Enabling Act</u>, the Constitution, and the Supreme Court's decision in <u>Friedman</u>, *supra* (holding admission on motion is constitutionally protected), warrants entry of a consent decree or stipulated judgment for the plaintiffs.

**FIFTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT 28 U.S.C. § 2201**

103. The preceding allegations are incorporated.  There is an actual controversy of sufficient immediacy and concreteness relating to the legal rights of the plaintiffs and their injury, and their relation to and the duties of the defendants to warrant relief under 28 U.S.C. § 2201.

Plaintiffs therefore request the following relief:

- An Order abrogating U.S. District Court "local" Rules in the Ninth Circuit that deny *general* admission privileges to plaintiffs and other non—forum sister-state attorneys.
- An Order declaring Federal District Court "local" Rules that deny *general* admission privileges to non-forum State attorneys is unlawful.
- An Order admitting Plaintiffs to the bar of the District Courts in California.
- Costs.
- Attorney fees.
- Grant such other relief as may be just and proper.

Dated:  May 5, 2010            Respectfully submitted,

/s/ *Joseph Robert Giannini*

_____
For Plaintiffs NAAMJP et. al.
Joseph Robert Giannini, Esq.
Pennsylvania State Bar 38814
925 S. Westgate Ave. #102
Los Angeles, CA 90049
Phone 310 442 9386
Email j.giannini@verizon.net